## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| **STATE OF IDAHO; STATE OF NORTH DAKOTA; STATE OF ALASKA; STATE OF IOWA; STATE OF NEBRASKA; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF WYOMING** | |
| | **Case No. _____** |
| *Plaintiffs*, | **Hon. _____** |
| **v.** | |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; and MICHAEL S. REGAN, in his official capacity as Administrator of the United States Environmental Protection Agency,** | |
| *Defendants.* | |

## COMPLAINT AND PETITION FOR REVIEW

Plaintiff States of Idaho, North Dakota, Alaska, Iowa, Nebraska, South Carolina, South Dakota, and Wyoming ("Plaintiff States") for their Complaint allege as follows:

### INTRODUCTION

1.     In 1972, Congress overhauled the Federal Water Pollution Control Act and enacted what is now known as the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251.

Congress paired that overall objective with a national goal to eliminate the discharge of pollutants into navigable waters by 1985 and an interim national goal to achieve water quality by July 1, 1983, that "provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water." *Id.*

2.      Those two national goals also set the framework for the CWA regulatory scheme. Congress tasked the EPA to regulate the discharge of pollutants from point sources (discrete conveyances like pipes, channels, or ditches) into navigable waters, which the EPA does through the National Pollutant Discharge Elimination System (NPDES) permit program. On the other hand, Congress reserved to states the authority to set standards to govern the quality of waters flowing through their states. Although those "water quality standards" are approved by the EPA, Congress ensured that states would have the right to designate uses and set criteria to protect the designated uses. States may consider any use classification they see fit, provided the designated use is consistent with the CWA.

3.      Since 1972, the EPA has maintained that states need only consider uses set forth in two provisions of the CWA. Pursuant to CWA Section 101(a), 33 U.S.C. § 1251, states consider "protection and propagation of fish, shellfish, and wildlife" and "recreation in and on the water" as designated uses. And pursuant to Section 303(c), 33 U.S.C. § 1313, states consider "public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and . . .

navigation" as designated uses. But again, states need only *consider* those uses—the EPA has not mandated states to adopt particular uses as designated uses.

4.      That is, until May 2, 2024, when the EPA published a final rule that attempts to fundamentally change the regulatory scheme Congress enacted in the CWA. The new rule, titled "Water Quality Standards Regulatory Revisions to Protect Tribal Reserved Rights," 89 Fed. Reg. 35717, unlawfully recasts the CWA as a "Tribal Rights Act" and commandeers states to effectuate the new policy imposed unilaterally by the EPA.

5.      Under the Final Rule, which is attached as Exhibit 1, the EPA forces states to protect "tribal reserved rights"—a novel concept the EPA cut out of whole cloth that means "any rights CWA-protected aquatic and/or aquatic-dependent resources reserved by right holders, either expressly or implicitly, through Federal treaties, statutes, or Executive orders." 89 Fed. Reg. 35747.

6.      States may no longer designate uses as they see fit, needing only to consider CWA-specified uses. Now whenever a tribe claims a "tribal reserved right," something it may do by simply sending a state official an email or even by raising the claim in a distinct and distant context, states must (1) consider the use and value of their state waters for protecting the tribal reserved right when adopting or revising designated uses; (2) consider the anticipated future exercise of the tribal reserved right unsuppressed by water quality (*i.e.*, how would a tribe exercise its claimed right if water quality were not a factor) when setting water quality standards; and (3) establish water

quality criteria necessary to protect the claimed tribal reserved right whenever a state adopts a designated use that expressly incorporates the claimed right or could be said to merely "encompass the right," even if the state deliberately decided not to protect the claimed right as a designated use. 89 Fed. Reg. 35747-48.

7.     And to make sure states have been sufficiently stripped of their authority to set designated uses, the EPA mandates disapproval of any water quality standard that does not adequately protect a claimed tribal reserved right and then reserves for itself the right to set water quality standards it deems consistent with its new policy of protecting tribal reserved rights. 89 Fed. Reg. 35747.

8.     The Final Rule also necessarily forces states to ensure tribes quantities of water—so-called *Winters* rights—even though the CWA unequivocally leaves quantification of water rights to states: "the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated, or otherwise impaired" and nothing in the CWA "shall be construed to supersede or abrogate rights to quantities of water which have been established by any State." 33 U.S.C. § 1251(g).

9.     From top to bottom, the Final Rule exceeds the EPA's authority under the CWA. Congress did not grant the EPA authority under the CWA to protect claimed tribal rights—the EPA's mission is focused only on protecting "the chemical, physical, and biological integrity of the Nation's waters." And to achieve that objective, Congress told the EPA that water quality standards should be based on statutorily specified uses. None of those uses includes uses that tribes claim rights to.

10.     Through this rulemaking, the EPA has taken upon itself to recast the CWA's scope by inserting its own extra-statutory policy initiatives under the guise of the CWA. Nor did Congress deputize the EPA as arbiters of water rights and treaty interpretation, let alone give the EPA the power to commandeer states into protecting and adjudicating alleged tribal reserved rights for the federal government.

11.     That regulatory excess alone is fatal to the Final Rule. But the Final Rule is also impermissibly vague. It provides states with no intelligible guidance the scope of their new obligations regarding "tribal reserved rights." That much is clear by the Final Rule's admission that such determinations require a case-by-case inquiry. 89 Fed. Reg. 35718. And it is no cure that the EPA has made itself "available to help" states. 89 Fed. Reg. 35737. The Final Rule leaves states in the dark on what their new obligations are in setting water quality standards for their waters.

12.     The EPA cannot command states to figure out and then make good on obligations the federal government may owe tribes. Principles of federalism do not allow it, and the CWA certainly does not require it.

13.     The Final Rule also unconstitutionally disrupts state-tribal relationships by compelling states to evaluate and protect claimed but undefined, and virtually unknowable, rights which the federal government may have reserved for the tribes. The Final Rule enacts a monumental policy shift, alters the aim of the CWA, and imposes significant costs on states, both economically and politically. But Congress did not delegate to the EPA such an issue of major political and economic significance.

14.     With just 30 days' notice between publication and implementation of the Final Rule, the EPA is forcing immense and nearly immediate harm on states. Because the Final Rule is unlawful in numerous respects and will inflict great harm on states, Plaintiff States bring suit to stay implementation of the Final Rule under 5 U.S.C. § 705, enjoin the EPA from enforcing the Final Rule in Plaintiff States, and declare the Final Rule invalid and vacate it.

## PARTIES

15.     The States of Idaho, North Dakota, Alaska, Iowa, Nebraska, South Carolina, South Dakota, and Wyoming are sovereign entities that regulate land use, water quality, and water resources within their borders through duly enacted state laws administered by state agencies. Plaintiff States also directly administer certain provisions of the CWA, *see* 33 U.S.C. §§ 1251-1387, and each has been delegated authority to implement additional programs under 33 U.S.C. § 1342(b).

16.     Defendant United States Environmental Protection Agency is a federal agency within the meaning of the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 551(1). Under the CWA, the EPA administers water quality programs over statutorily defined waters.

17.     Defendant Michael S. Regan is the Administrator of the EPA, acting in his official capacity. Administrator Regan published the Final Rule on May 2, 2024. The Final Rule is set to be effective on June 3, 2024.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action by virtue of 28 U.S.C. §§ 1331 (federal question), 2202 (further necessary relief), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act). There is a present and actual controversy between the parties, and Plaintiffs are challenging a final agency action pursuant to 5 U.S.C. §§ 551(13) and 704. The Court may issue further necessary relief pursuant to 28 U.S.C. § 2202, 5 U.S.C. §§ 706(1), 706(2)(A), and (C), as well as pursuant to its general equitable powers.

19.     This suit is not a challenge to any of the "seven categories of EPA actions for which review lies directly and exclusively in the federal courts of appeals." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 623 (2018) (citing 33 U.S.C. § 1369(b)(1)).

20.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(C), because Plaintiff State of North Dakota resides in this district and Defendants are agencies of the United States or officers thereof acting in their official capacity.

## BACKGROUND

21.     The Final Rule was published by Defendant Administrator Regan on May 2, at 89 Federal Register 35717. A true and correct copy of the Final Rule is attached as Exhibit 1.

22.     Before adopting the Final Rule, the EPA published a Proposed Rule. *See* Water Quality Standards Regulatory Revisions to Protect Tribal Reserved Rights, 87 Fed. Reg. 74361-01 (Dec. 5, 2022), attached as Exhibit 2. Plaintiff States Idaho, North

Dakota, Alaska, Wyoming, and South Dakota submitted comments on the Proposed Rule, attached as Exhibits 3-9.

23.    The CWA requires development, review, revision, and approval of water quality standards by states. 33 U.S.C. § 1313.

24.    The Final Rule impermissibly requires, *inter alia*, that "[w]here a right holder has asserted a Tribal reserved right in writing to the State and EPA," (1) consider the use and value of their state waters for protecting the tribal reserved right when adopting or revising designated uses; (2) consider the anticipated future exercise of the tribal reserved right unsuppressed by water quality (*i.e.*, how would a tribe exercise its claimed right if water quality were not a factor) when setting water quality standards; and (3) establish water quality criteria necessary to protect the claimed tribal reserved right whenever a state adopts a designated use that expressly incorporates the claimed right or could be said to merely "encompass the right," even if the state deliberately decided not to protect the claimed right as a designated use. 89 Fed. Reg. 35747-48.

25.    The Final Rule defines tribal reserved rights as "any rights to CWA-protected aquatic and/or aquatic-dependent resources reserved by right holders, either expressly or implicitly, through Federal treaties, statutes, or Executive orders." 89 Fed. Reg. 35747. These rights "include but are not limited to the rights to fish; gather aquatic plants; and to hunt for aquatic-dependent animals," as well as "ceremonial practices." 89 Fed. Reg. 35726. The Final Rule fails to adequately define "aquatic-dependent

resources", "aquatic-dependent animals", or "CWA-protected aquatic and/aquatic-dependent resources."

26.     The Final Rule defines right holders as "any Federally recognized Tribes holding Tribal reserved rights, regardless of whether the Tribe exercises authority over a Federal Indian reservation." 89 Fed. Reg. 35747.

### A.     The Final Rule Conflicts with the CWA's Recognition of State Authority Over State Water Quality Standards.

27.     The CWA is based on a federal-state partnership, known as "a program of cooperative federalism." *PUD No. 1 of Jefferson Cnty. v. Wash. Dept. of Ecology*, 511 U.S. 700, 703-04 (1994); *City of Abilene v. U.S. E.P.A.*, 325 F.3d 657, 659 (5th Cir. 2003) (quoting *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992)); *New York v. United States*, 505 U.S. 144, 167 (1992).

28.     Under the CWA, states retain the primary rights and responsibilities to protect waters within their boundaries, while the EPA retains an oversight role to ensure compliance with the CWA:

> It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter.

33 U.S.C. § 1251(b) (emphasis added).

29.     The CWA assigns states the primary authority for developing, adopting, and enforcing water quality standards. 33 U.S.C. § 1313(a) and (c). On June 5, 2018, the

EPA approved Idaho's application to administer and enforce the Idaho Pollutant Discharge Elimination System ("IPDES"), 33 U.S.C. § 1342(b), and to issue CWA 401 certifications, 33. U.S.C. § 1341(a). On April 11, 2019, the EPA approved a transfer of North Dakota's authority to administer and enforce the North Dakota Pollutant Discharge Elimination System Program ("NDPDES" or the "Permits Program") from the North Dakota Department of Health to the North Dakota Department of Environmental Quality ("NDDEQ"), 84 Fed. Reg. 14658, and to issue CWA 401 certifications, 33. U.S.C. § 1341(a).[1]

30.     The CWA gives the EPA limited authority to review state-adopted water quality standards, 40 C.F.R. §§ 131.6, 131.5(a), and approve or disapprove those standards, 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. § 131.5(a).

31.     Water quality standards define the goals for use of a water body and the quality of the water (i.e., criteria) necessary to support that use. These standards are made up of three elements: beneficial uses, water quality criteria, and a policy to prevent degradation of a high-quality waterbody. The CWA identifies these elements and provides authority to the individual states to develop standards while retaining oversight authority to EPA to review and approve.

32.     For example, in Idaho, any change or update to the water quality standards requires a change to Idaho's administrative procedures and therefore is subject to state-

---

[1] The EPA had previously approved North Dakota's application for the North Dakota Department of Health to administer the program. With the creation of the NDDEQ, this authority was transferred.

law rulemaking requirements. Idaho's rulemaking requirements include public stakeholder meetings where rule language is drafted, discussed, and negotiated prior to publishing a proposed rule in Idaho's Administrative Bulletin. Following a public comment period (typically 30 days) a proposed rule is presented to the Idaho Board of Environmental Quality where the Board considers the proposed rule and takes public testimony on it.

33.     A successful rule is adopted by the Board and then goes before the Idaho Legislature as a pending rule. Idaho's Legislature has the opportunity to review and must approve rules by a concurrent resolution.

34.     Once a rule has been approved by the Legislature it will become effective on July 1 of the year of approval. The Idaho Department of Environmental Quality will then submit to the EPA for review and approval the final rule language along with supporting documentation on how the rule was drafted and its implications. The EPA may approve the rule or disapprove the rule within statutory limits. If the EPA chooses to disapprove, they are responsible for promulgating standards if the standards are required under the CWA. In all, the process to conduct rulemaking, gain Board and Legislative approval, and final EPA approval is at least a year's long endeavor at a minimum.

35.     The Idaho Department of Environmental Quality evaluates the need to update water quality standards routinely, but at least every three years. This three-year requirement comes from the federal regulations and is referred to as a triennial review.

During the triennial review, the Idaho Department of Environmental Quality holds public meetings to take input on potential changes or updates that the public may want to see to the water quality standards along with providing information to the public on any actions that the agency is proposing to take based on updates to the federal regulations.

36.     While the Idaho Department of Environmental Quality is required to conduct a review of the rule chapter every three years, the historic practice has been to enter the public rulemaking process when necessary to update the water quality standards even if it falls outside of the triennial review process.

37.     The CWA nowhere authorizes the EPA to promulgate rules regarding tribal reserved rights, particularly ones that commandeer states' primacy and require the states to evaluate and protect undefined and unproven tribal reserved rights.

38.     The Final Rule will require states to protect tribal reserved rights by ensuring tribes the right to quantities of water needed to secure their claimed rights and uses, even if the states have determined water quantities inconsistent with the tribal claims. For example, where a tribe asserts a right to fish and claims that the alleged fishing right requires a certain flow rate to ensure full enjoyment of the fishing right, the Final Rule requires states protect the alleged tribal reserved fishing right by guaranteeing water quantity rights to the tribe. 89 Fed. Reg. 35727.

39.     That is flatly inconsistent with the CWA, which promises that "the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired." 33 U.S.C. § 1251(g).

**B.     States Cannot Be Required to Protect Tribal Reserved Rights.**

40.     The Final Rule's requirement to protect "expressly or implicitly" reserved tribal rights asserted by a federally recognized tribe demands that Plaintiff States evaluate the legitimacy of a written assertion of a tribal reserved right. This would require evaluation of "Federal treaties, statutes, and Executive orders," a determination of the nature and extent of any tribal reserved rights allegedly derived from any or all of those vague sources which might relate to aquatic and/or aquatic-dependent resources, application of those alleged rights to water quality criteria, and creation of water quality criteria to protect those tribal reserved right. *See* 89 Fed. Reg. 35747-48.

41.     Needless to say, treaty rights promised by the federal government to the tribes are socially, politically, and legally complex issues. The Final Rule however, requires the states to determine "whether such an instrument is properly interpreted to reserve a right to an aquatic or aquatic-dependent resource." 89 Fed. Reg. 35724.

42.     To determine applicability of a tribal reserved right to state waters, the EPA states the "key inquiry in determining whether a right to 'to [a] CWA-protected aquatic and/or aquatic-dependent resource []' for purposes of this rule is whether the right falls within the ambit of the resources protected under the CWA." 89 Fed. Reg. 35726. The EPA says that CWA water quality standards "should, wherever attainable,

provide water quality for the protection and propagation of fish, shellfish and wildlife and for recreation in and on the water and take into consideration the use and value of public water supplies, propagation of fish, shellfish, and wildlife, recreation in and on the water, and agricultural, industrial, and other purposes including navigation." *Id.* Thus, under the Final Rule, "any aquatic or aquatic-dependent resources or practices to which Tribes have reserved rights that fall within that ambit may be relevant Tribal reserved rights for purposes of this rule." *Id.*

43.     The Final Rule triggers state interpretation of tribal reserved rights "[w]here a right holder has asserted a Tribal reserved right in writing to the State and EPA." 89 Fed. Reg. 35747-48. The Final Rule provides no guidance on inevitable disagreements—between the tribes themselves, between the tribes and States, and between the tribes and the federal government—over the extent and nature of any alleged reserved rights.

44.     Disagreements over who might hold tribal reserved rights, as well as the nature and extent of those rights, have been the subject of countless lawsuits. For instance, in 1854-1855, a collection of ten treaties were negotiated with over 60 tribes and bands from Puget Sound to Montana across the then-Washington Territory (the "Stevens Treaties"). Interpretation and application of the Stevens Treaties' fishing rights alone have been addressed in seven Supreme Court decisions, at least 30 Ninth Circuit decisions, and numerous federal district court and state court decisions. Numerous other cases have addressed Stevens Treaties' hunting rights and resource

gathering rights. And the Fort Laramie Treaty, which established the Great Sioux Reservation in what is now western South Dakota and part of North Dakota, was subject to litigation for over sixteen years regarding tribal hunting and fishing rights, including disposition by the United States Supreme Court. *See S.D. v. Bourland*, 508 U.S. 679, 682 (1993); *Lower Brule Sioux Tribe v. State of S.D.*, 104 F.3d 1017, 1020 (8th Cir. 1997).

45.     Claims to tribal rights for aquatic and aquatic-dependent resources have been the basis of numerous in-stream water right claims in Idaho, and have already been the subject of extensive negotiation, adjudication, litigation, and settlement agreements. *See, e.g.*, SRBA Shoshone-Bannock Consent Decree, *In re SRBA Case No. 39576* (Twin Falls Cnty. Dist. Ct. Aug. 2, 1995) (settlement between Idaho, the United States, and the tribes confirming water rights of the Shoshone-Bannock Tribes of the Fort Hall Indian Reservation in Snake River Basin Adjudication ("SRBA")); SRBA Shoshone-Paiute Consent Decree, *In re SRBA Case No. 39576*, Nos. 51-12767, 51-12756, 51-02002 (Twin Falls Cnty. Dist. Ct. Dec. 12, 2006) (settlement between Idaho, the United States, and the tribes confirming water rights of the Shoshone-Paiute Tribes of the Duck Valley Indian Reservation in the SRBA); SRBA Nez Perce Consent Decree, *In re SRBA Case No. 39576* (Twin Falls Cnty. Dist. Ct. Jan. 30, 2007) (settlement between Idaho, the United States, and the tribes confirming water rights of the Nez Perce Tribe in the SRBA).

46.     And in North Dakota, disagreements regarding tribal water rights and a pipeline crossing caused an international spectacle, the aftermath of which resulted in numerous criminal and civil actions which continue to be litigated today. *See Mitchell v. Morton County Sheriff Kyle Kirchmeier, et al.,* (D.N.D 1:19-cv-149); *Poemoceah v. Morton County, et al,.* (D.N.D. 1:18-cv-00236); *Thunderhawk v. County of Morton, et al.,* (D.N.D.1:18-cv-00212); *Wilansky v. Morton County, et al.,* (D.N.D 1:18-cv-00236); *Wilansky v. Morton County et al,.* (D.N.D. 3:23-cv-0014); *Standing Rock Sioux Tribe v. United States Army Corps of Engineers,* 985 F.3d 1032, 1039 (D.C. Cir. 2021), cert. denied sub nom. *Dakota Access, LLC v. Standing Rock Sioux Tribe,* 142 S. Ct. 1187 (2022); *see also* Charles Carvell, *Indian Reserved Water Rights: Impending Conflict or Coming Rapprochement Between the State of North Dakota and North Dakota Indian Tribes,* 85 N.D. L. Rev. 1 (2009) (noting "[o]ne hundred years after the Supreme Court declared the Indian reserved water right, water rights held by North Dakota tribes remain unquantified").

47.     The ongoing litigation between the Coeur d'Alene Tribe and Idaho in the Coeur d'Alene Spokane River Basin Adjudication exemplifies the difficult and time-consuming requirements needed to determine the nature and extent of tribal reserved rights and how those treaty rights translate into State administered water rights. *See In re CSRBA Case No. 49576 Subcase No. 91-7755,* 165 Idaho 517, 448 P.3d 322 (2019). In March 2014, the United States filed notice of claims for 353 tribal reserved rights on behalf of the Coeur d'Alene Tribe. *Id.* Entitlement to those rights was not fully determined until September of 2019. Competing claims regarding the quantity of the

remaining reserved water rights will not likely be resolved in the trial court until 2026, a full twelve years after the tribal claims were initially made. Appeals of trial court decisions are likely, pushing final resolution beyond that.

48.     Determination of tribal reserved rights and potential accompanying water rights for all of Idaho's tribes, across all of Idaho's 95,000 miles of streams and rivers, and myriad lakes, is an unworkable task for the EPA to delegate to state water management agencies, especially given the Final Rule's triennial water quality standard review requirement.

## HARM TO PLAINTIFF STATES

49.     The Final Rule harms Idaho by (1) expanding federal regulation beyond that authorized in the CWA; (2) eroding Idaho's authority over its own waters; (3) increasing Idaho's administrative burdens while diminishing abilities to administer its own programs; (4) undermining Idaho's sovereignty to regulate its internal affairs as guaranteed by the Constitution; and (5) imposing significant implementation costs on Idaho's regulating entities and regulated industries. The CWA preserves Idaho's authority to set water quantities, but the Final Rule undermines and abrogates Idaho's authority.

50.     The Final Rule harms North Dakota by (1) expanding federal regulation beyond that authorized in the CWA; (2) eroding North Dakota's authority over its own waters; (3) increasing North Dakota's administrative burdens while diminishing abilities to administer its own programs; (4) undermining North Dakota's sovereignty to

regulate its internal affairs as guaranteed by the Constitution; and (5) imposing significant implementation costs on North Dakota's regulating entities and regulated industries. The CWA preserves North Dakota's authority to set water quantities, but the Final Rule undermines and abrogates North Dakota's authority.

51.     The Final Rule harms Alaska by (1) expanding federal regulation beyond that authorized in the CWA; (2) eroding Alaska's authority over its own waters; (3) increasing Alaska's administrative burdens while diminishing abilities to administer its own programs; (4) undermining Alaska's sovereignty to regulate its internal affairs as guaranteed by the Constitution; and (5) imposing significant implementation costs on Alaska's regulating entities and regulated industries. The CWA preserves Alaska's authority to set water quantities, but the Final Rule undermines and abrogates Alaska's authority.

52.     The Final Rule harms Iowa by (1) expanding federal regulation beyond that authorized in the CWA; (2) eroding Iowa's authority over its own waters; (3) increasing Iowa's administrative burdens while diminishing abilities to administer its own programs; (4) undermining Iowa's sovereignty to regulate its internal affairs as guaranteed by the Constitution; and (5) imposing significant implementation costs on Iowa's regulating entities and regulated industries. The CWA preserves Iowa's authority to set water quantities, but the Final Rule undermines and abrogates Iowa's authority.

53.     The Final Rule harms Nebraska by (1) expanding federal regulation beyond that authorized in the CWA; (2) eroding Nebraska's authority over its own

waters; (3) increasing Nebraska's administrative burdens while diminishing abilities to administer its own programs; (4) undermining Nebraska's sovereignty to regulate its internal affairs as guaranteed by the Constitution; and (5) imposing significant implementation costs on Nebraska's regulating entities and regulated industries. The CWA preserves Nebraska's authority to set water quantities, but the Final Rule undermines and abrogates Nebraska's authority.

54. The Final Rule harms South Carolina by (1) expanding federal regulation beyond that authorized in the CWA; (2) eroding South Carolina's authority over its own waters; (3) increasing South Carolina's administrative burdens while diminishing abilities to administer its own programs; (4) undermining South Carolina's sovereignty to regulate its internal affairs as guaranteed by the Constitution; and (5) imposing significant implementation costs on South Carolina's regulating entities and regulated industries. The CWA preserves South Carolina's authority to set water quantities, but the Final Rule undermines and abrogates South Carolina's authority.

55. The Final Rule harms South Dakota by (1) expanding federal regulation beyond that authorized in the CWA; (2) eroding South Dakota's authority over its own waters; (3) increasing South Dakota's administrative burdens while diminishing abilities to administer its own programs; (4) undermining South Dakota's sovereignty to regulate its internal affairs as guaranteed by the Constitution; and (5) imposing significant implementation costs on South Dakota's regulating entities and regulated industries.

The CWA preserves South Dakota's authority to set water quantities, but the Final Rule undermines and abrogates South Dakota's authority.

56.     The Final Rule harms Wyoming by (1) expanding federal regulation beyond that authorized in the CWA; (2) eroding Wyoming's authority over its own waters; (3) increasing Wyoming's administrative burdens while diminishing abilities to administer its own programs; (4) undermining Wyoming's sovereignty to regulate its internal affairs as guaranteed by the Constitution; and (5) imposing significant implementation costs on Wyoming's regulating entities and regulated industries. The CWA preserves Wyoming's authority to set water quantities, but the Final Rule undermines and abrogates Wyoming's authority.

57.     The Final Rule violates the Plaintiff State's sovereignty. The Tenth Amendment provides States with traditional authority over their own lands and waters. *See, e.g.*, *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 44 (1994) (holding that "regulation of land use [is] a function traditionally performed by local governments"). The Final Rule requires Plaintiff States to consider and determine the extent of asserted tribal reserved rights and formulate new water quality standards that incorporate and protect those undefined rights—which would also require Plaintiff States to reevaluate their myriad existing permits and certifications, including, *inter alia*: Section 401 certifications, State administered NPDES permits, aquaculture permits, drinking water treatment facility permits, groundwater remediation permits, suction dredge mining permits, pesticide permits, municipal and industrial wastewater reuse permits, publicly

owned treatment works permits, storm water permits, non-point source management programs, dam construction permits, stream alteration permits, and confined animal feeding operation permits.

58.     In addition to loss of the Plaintiff States' sovereignty, their agencies will suffer irreparable harm implementing the Final Rule. Every water quality standard set by Plaintiff States is now subject to new, costly, and unlawful requirements to protect tribal reserved rights. The Final Rule will require Plaintiff States to engage in protracted discussions with "right holders" and the EPA, to prioritize tribal interests of state and citizen interests, to devote countless hours and dollars evaluating claimed tribal reserved rights, and to alter water quantity determinations. The costs to implement the new rule are as certain as they are incalculable.

59.     For example, the Idaho Department of Environmental Quality has an estimated 2,000 dischargers under the various individual and general permits issued in Idaho. The Final Rule's requirements for new criteria will result in more stringent standards, requiring higher and more costly treatment. The Idaho Department of Environmental Quality must evaluate claimed tribal reserved rights, establish new criteria, and update existing human health criteria, all at significant cost to the agency.

60.     Additionally, South Dakota was in the process of its triennial review when the Final Rule was published. Because of the onerous and expensive requirements imposed by the Final Rule, combined with the legal uncertainty it raises, South Dakota revised the agenda of its Water Management Board, a division of the South Dakota

Department of Agriculture and Natural Resources, to temporarily postpose the triennial review process. However, that process cannot be postponed indefinitely and requires completion in compliance with the CWA's requirements. The Final Rule is thus immediately impacting South Dakota and its water quality standards.

61.     The Final Rule is, or will imminently, also harm each Plaintiff State and its water quality standards in similar ways.

62.     Additionally, in North Dakota, Idaho, and the other Plaintiff States, the Final Rule's vague definition of tribal reserved rights would thrust Plaintiff States' environmental regulatory agencies squarely into the thicket of determining the scope of tribal treaty rights.

63.     The Final Rule usurps the role of the Plaintiff States in the CWA, which recognizes the State as having primary responsibility over environmental management. 33 U.S.C. § 1251(b). Moreover, because the Final Rule is vaguely constructed, state agencies will be forced to spend additional time and resources interpreting and implementing the Final Rule's requirements.

64.     The Final Rule plainly exceeds the scope of the EPA's statutory authority under the CWA. The EPA's overreach harms Plaintiff States' sovereign interest in managing its own waters, land, and resources and the Rule imposes on Plaintiff States significant and unrecoverable implementation costs. Accordingly, the Final Rule violates the Constitution, the CWA, and the APA.

## COUNT I
## (Violation of 5 U.S.C. § 706 – Agency Action in Excess of Statutory Authority)

65.     Plaintiff States re-allege and incorporate by reference the facts and allegations set forth in all preceding paragraphs as if set forth in full herein.

66.     Under the APA, a final agency action may be held unlawful and set aside if it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

67.     Congress did not delegate to EPA any rulemaking authority with respect to tribal reserved rights. The CWA's water quality standard provisions delegate a limited and specific role to the EPA, and that role does not include interpreting treaties or overseeing tribal reserved rights.

68.     The CWA cannot be expanded by the EPA to require states to protect tribal reserved rights. In fact, contrary to the EPA's contention that it is obligated "to ensure that its actions are consistent with treaties," *see* 87 Fed. Reg. 74365; 89 Fed. Reg. 35723, the CWA actually limits the EPA's authority in regard to treaties: "This Act shall not be construed as… affecting or impairing the provisions of any treaty of the United States." 33 U.S.C. § 1371(a). Far from a mandate to interpret treaties, CWA section 511(a)(3) explicitly directs that the CWA cannot affect treaties. Yet, the Final Rule attempts to do just that by requiring the interpretation of tribal treaties by state environmental regulators, the tribes themselves, and ultimately the EPA. *See* 89 Fed. Reg. 35724 (EPA does not adequately address its authority to engage in treaty

interpretation in the first place, instead arguing merely that the "relevant question is . . . whether such an instrument is properly interpreted to reserve a right.")

69.     Except for McCarran Amendment proceedings under the jurisdiction of state law in state courts, federal courts have sole jurisdiction over questions of treaty-guaranteed rights. *See* 28 U.S.C. § 1362; *Confederated Salish and Kootenai Tribes of Flathead Reservation, Montana v. Flathead Irr. & Power Project*, 616 F. Supp. 1292, 1295 (D. Mont. 1985). Despite this lack of authority, the Final Rule requires states to engage in treaty interpretation while purporting to commit the EPA to assist "in evaluating Tribal reserved rights" and "initiating the Tribal consultation process with any right holders that have asserted their rights for consideration." 89 Fed. Reg. 35718.

70.     The EPA claims authority found nowhere in the CWA or historical practice to interpret tribal treaties for itself and to override state standards under the guise of protecting tribal rights. Treaties between the United States and tribes are not grants of authority to EPA, and the Final Rule points to no treaty that would grant the EPA the authority it claims. Thus, the EPA lacks statutory authority to "harmonize" tribal treaty rights with the CWA. *See* 89 Fed. Reg. 35721.

71.     As the Supreme Court recently warned the EPA, it must find clear authorization in the statutory text when it claims newfangled authority to regulate in an area where it has "no comparative expertise"—here, in purportedly protecting tribal treaty rights. *West Virginia v. EPA*, 142 S. Ct. 2587, 2612-13 (2022). Congress has not delegated—much less clearly delegated—tribal treaty interpretation or enforcement

power to the agency, and the Final Rule underscores the EPA's lack of expertise in construing agreements between sovereigns.

72.     In promulgating the Final Rule, the EPA purports to give itself jurisdiction over the interpretation of tribal treaties when establishing CWA water quality standards. This self-granted authority exceeds the grant of jurisdiction made to the EPA by the plain language of the CWA and guiding precedent. Accordingly, in adopting the Final Rule, EPA exceeded its statutory jurisdiction, authority, and limitations under the CWA. 5 U.S.C. § 706(2)(C).

73.     The Final Rule also requires Plaintiff States and the EPA to determine the express and implicit rights contained in unspecified and indeterminate treaties, statutes, and executive orders, and then incorporate those rights into CWA decision-making. *See* 89 Fed. Reg. 35747-48; 87 Fed. Reg. 74368 ("EPA encourages ongoing communication between states and right holders to help states ascertain where reserved water rights apply and what data are available to inform the level of water quality necessary to protect those rights.")

74.     The CWA grants states broad discretion to set water quality standards based on state determined designated uses. The Act prescribes that such standards, which include designated uses and water quality criteria to protect those uses, "shall be such as to protect the public health or welfare, enhance the quality of water and serve the purposes of this chapter," and "shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational

purposes, and agricultural, industrial, and other purposes, and also taking into consideration their use and value for navigation." 33 U.S.C. § 1313(c)(2)(A). The Act does not prescribe precisely how a state must weigh each factor, so long as the resulting standards are protective. Yet, the Final Rule precludes the discretion the Act grants to Plaintiff States, without any statutory authority to do so.

75.      The CWA does not protect particular rights—and, it surely is not intended to protect amorphous tribal treaty rights, which are mentioned nowhere in the CWA's text. *See* 33 U.S.C. § 1251(a). Contrary to the Final Rule, Congress expressly directed that the CWA would not "supersed[e], abrogate[e] or otherwise impair[]" States' authority to manage its water resources. 33 U.S.C. § 1251(g). The Final Rule creates new regulations directing the protection of unknown rights potentially contained in unspecified treaties or other unidentified documents or areas of federal law. But the EPA is only authorized to create water quality standards protecting those purposes and uses contained in the CWA—of which tribal treaty rights are not included. By the Final Rule, the EPA not only exceeds its delegated authority in directing the protection of treaty rights, it violates an express policy of the CWA by interfering with states' administration of their water resources.

76.      Additionally, Section 303(c) directs that the creation of water quality standards must "tak[e] into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also tak[e] into consideration their use and value for navigation."

33 U.S.C. § 1313(c)(2)(A). Thus, while the propagation of fish and wildlife is an appropriate consideration in establishing water quality standards, there is no provision forcing states to protect claimed tribal <u>rights</u> to water or aquatic and aquatic-dependent resources.

77.     The CWA addresses the protection of America's water <u>quality</u>. It cannot be a vehicle to protect, interpret, or adjudicate what rights tribes may have—in unidentified and unknown federal law or treaties—to the water itself, or aquatic-dependent resources.

78.     The Final Rule's mandate to determine tribal reserved rights, and prepare, adopt, and enforce new water quality standards based thereon exceeds the EPA's statutory jurisdiction, authority, and limitations under the CWA, 5 U.S.C. § 706(2)(C), constituting a significant federal overreach that infringes on the authority and discretion of the sovereign States.

79.     The CWA provides authority to the EPA to determine whether a new or revised standard is consistent with the requirements of the Act. 33 U.S.C. § 1313(c)(3); 40 C.F.R. § 131.21. But the EPA's policy of tribal consultation created by the Final Rule is inapplicable to water quality standards and is not authorized by the CWA.

80.     The Final Rule also expands the scope of the CWA to provide tribes—with no previous right to treatment as a state or right to water management and protection under the CWA—new authority. The EPA explicitly determines in the Final Rule's definition that "'right holders can include federally recognized Tribes that are

outside the scope of the definition at 40 CFR 131.3(l)." 89 Fed. Reg. 35726. Thus, the Final Rule impermissibly expands the scope of the CWA beyond the express limits set by Congress to provide tribes rights to water management and protection "regardless of whether the Tribes exercises authority over an Indian reservation." 89 Fed. Reg. 35747.

81.     By the Final Rule, the EPA grants tribes an involvement in approving or disapproving state water quality standards that is inconsistent with the CWA, in violation of the EPA's statutory jurisdiction, authority, and limitations under the CWA. 5 U.S.C. § 706(2)(C).

82.     Under the major questions doctrine, federal agencies are not authorized to determine their own jurisdiction. As the Supreme Court has explained, an agency's claim of authority through the rulemaking process must be clearly supported by statute before providing an agency "unheralded regulatory power over a significant portion of the American economy." *West Virginia v. Envtl. Prot. Agency*, 142 S. Ct. 2587, 2608 (2022) (cleaned up). Therefore, an agency's claim of authority must be rejected when: (1) the rule concerns an issue of economic and political significance; and (2) Congress has not clearly empowered the agency with the statutory authority. The Court should "hesitate before concluding that Congress meant to confer such authority" that EPA grants itself in the Final Rule. *See West Virginia v. Evntl. Prot. Agency*, 142 S. Ct. at 2608 (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-160 (2000)).

83. EPA asserts broad authority over Plaintiff States' agencies through the Final Rule. It subjects Plaintiff States, their agencies, and their citizens to a costly, new, and confusing regulatory framework. Moreover, EPA expands its own authority without clear statutory support. This starkly conflicts with the CWA's specific recognition, preservation, and protection of the States' primary right and responsibility to establish designated uses and consequent water quality standards. Thus, because Congress did not empower EPA to interpret its own jurisdiction—thereby exerting unheralded power over Plaintiff States, their citizens, and their agencies—EPA exceeds its statutory jurisdiction, authority, and limitations under the CWA. 5 U.S.C. § 706(2)(C).

## COUNT II
### (Violation of 5 U.S.C. § 706 – Agency Action in Excess of Constitutional Authority)

84. Plaintiff States re-allege and incorporate by reference the facts and allegations set forth in all preceding paragraphs as if set forth in full herein.

85. Under the Tenth Amendment, "[t]he powers not delegated to the United States by the Constitution . . . are reserved to the States respectively, or the people." U.S. Const., amend. X. The federal government lacks general police power and may only exercise powers expressly granted to it by the Constitution. *See id.*; *United States v. Lopez*, 514 U.S. 549, 566 (1995). Land-use planning, regulation, and zoning are not enumerated powers granted to the federal government. *See SWANCC*, 531 U.S. at 174 (recognizing the "States' traditional and primary power over land and water use"); *Hess*,

513 U.S. at 44 ("Among the rights and powers reserved to the States under the Tenth Amendment is the authority to its land and water resources."); *FERC v. Mississippi*, 456 U.S. 742, 768, n.30 (1982) ("regulation of land use is perhaps the quintessential state activity"). The courts traditionally expect "a 'clear and manifest' statement from Congress to authorize an unprecedented intrusion into traditional state authority." *Rapanos v. United States*, 547 U.S. 715, 738 (2006) (citing *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 544 (1994)). The CWA contains no "clear and manifest statement" authorizing EPA to regulate tribal reserved rights or treaty interpretation, nor to impose those new mandates on Plaintiff States and their citizens.

86.     The CWA was enacted pursuant to Congress's authority to regulate interstate commerce under Article I, Section 8 of the Constitution. As a result, EPA violates the Constitution when its enforcement of the CWA extends beyond the regulation of interstate commerce. *See SWANCC*, 531 U.S. at 173. In enacting the CWA, instead of authorizing intrusion onto State sovereignty, the CWA commands EPA to "recognize, preserve, and protect the primary responsibilities and rights of states . . . to plan the development and use . . . of land and water resources." 33 U.S.C. § 1251(b).

87.     The Final Rule mandates that: (1) state agencies determine the existence, nature, and scope of certain federal tribal legal rights; and (2) states consult with, and solicit information from, tribes. This is not a regulation of the channels or instrumentalities of interstate commerce, nor of an activity that "substantially affects"

interstate commerce. It is a regulation of State-Tribe relations and a mandate that States take a certain approach to interacting with tribes. Such a regulation is entirely unconnected to interstate commerce.

88.     The Final Rule also intrudes on the environmental regulatory powers vested to the States. U.S. Const., amend. X. The Final Rule exceeds Congress's authority to regulate interstate commerce. U.S. Const., art. I, § 8. The Final Rule is contrary to the CWA's protection of State sovereignty, and therefore, violates the CWA. 33 U.S.C. § 1251(b).

89.     The anti-commandeering doctrine safeguards the "fundamental structural decision incorporated into the Constitution" that the federal government may not issue affirmative ("do this") or negative ("avoid that") commands "directly to the States." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475 (2018). Commandeering threatens the "healthy balance of power between the States and the Federal Government" and distorts political accountability by blurring responsibility between States and the federal government and leaving State voters uncertain whom to "credit or blame" for a State action. *Id.* at 1477 (citations omitted).

90.     The Final Rule is impermissibly aimed at regulating states as sovereigns. It requires states to determine the existence and scope of federal tribal rights and requires states to manage State-Tribe relations on EPA's terms, in violation of the anti-commandeering doctrine. In short, the Final Rule forces states to gather, review, and

submit information from "right holders" and then to protect such claimed rights, all on behalf of the federal government.

91.     The Spending Clause empowers Congress to "lay and collect Taxes, . . . to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. The federal government may, within limits, use this power to encourage States to take certain actions that it could not otherwise require them to take.

92.     The federal government may "fix the terms on which it shall disburse federal money to the States." *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981). To validly exercise this power, the federal government must speak "unambiguously" and "with a clear voice" when articulating conditions. *Id.* These conditions must be articulated clearly enough for "the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* A state cannot knowingly accept a condition if the State "is unable to ascertain what is expected of it." *Id.*

93.     The Final Rule requires states ascertain the nature and scope of federal tribal rights that may not presently be recognized in law, without offering meaningful guidance on how to ascertain those rights. The closest EPA comes to speaking clearly is telling states to look at federal law and talk to tribes. Conditions that leave states unable to ascertain what is required—e.g., how to ascertain the nature and scope of a

right—are unconstitutional. *W. Virginia v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1143 (11th Cir. 2023).

94.     Plaintiff States never knowingly and voluntarily accepted any federal funds to enact the EPA's unilateral policy initiatives announced for the first time in the Final Rule. The Final Rule, therefore, violates the Spending Clause.

95.     In enacting the CWA, Congress did not create a trust obligation or fiduciary duty for the EPA to protect tribal treaty rights involving water resources. *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 898 (D.C. Cir. 2014). Because the CWA itself does not set forth such an obligation or duty, the EPA has no authority to impose such duties on itself or the States through rulemaking. Regardless of these constraints on its authority, the Final Rule mandates that all water quality standards established and approved by EPA or States "protect tribal reserved rights." The Final Rule therefore, can be interpreted to unlawfully create an actionable trust obligation.

96.     The Supreme Court has long recognized and repeatedly reaffirmed that "the organization and management of the trust is a sovereign function subject to the plenary authority of Congress." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 175-78 (2011) (citations omitted). When Congress establishes trust obligations, the applicable statute and implementing regulations "define the contours of the United States' fiduciary responsibilities" and, to assert a violation of such obligations, a tribe must be able to identify a "specific, applicable, trust-creating statute or regulation that the Government violated." *Id.*

97.     If Congress had intended to create a trust obligation or fiduciary duty through the CWA, it certainly knew how to do so. *See, e.g., United States v. Mitchell*, 463 U.S. 206 (1983); *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003); *United States v. White Mt. Apache Tribe*, 537. U.S. 465, 471 (2003). In short, a statute must unambiguously create a fiduciary duty, and Congress did not do so in the CWA. Accordingly, EPA's Final Rule violates the exclusive authority of Congress and is void.

98.     Under the APA, a final agency action may be held unlawful and set aside if it is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

99.     The CWA contains criminal and civil penalties for water quality standard violations. 33 U.S.C. § 1319 (b, c). The Due Process Clause of the Fifth Amendment requires adequate notice of what conduct is forbidden before criminal or civil penalties may attach and may not be so incomplete, vague, indefinite, or uncertain that persons of common intelligence must necessarily guess at its meaning and as to its application. *See, e.g., Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *Baggett v. Bullitt*, 377 U.S. 360, 371 (1964).

100.    The Final Rule fails to give adequate notice of what is, and what is not a tribal reserved right. By employing vague, undefined terms, and unweighted arbitrary factors that may or may not be employed by EPA, the Final Rule does not give adequate notice of how the central terms (like, "tribal reserved rights," "unsuppressed fish consumption rates," and "aquatic dependent resources") are defined and interpreted.

Accordingly, the Final Rule fails to give fair notice of what conduct is forbidden under the CWA and grants impermissible ad hoc discretion to EPA, guaranteeing arbitrary enforcement.

101.   The Final Rule also violates the Equal Protection clause, which provides that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States . . . nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend XIV, § 1. "[T]he Fifth Amendment imposes on the Federal Government the same standard required of state legislation by the Equal Protection Clause of the Fourteenth Amendment." *Schweiker v. Wilson*, 450 U.S. 221, 226 n.6 (1981). Equal protection of the laws requires that a law must deal alike with all within the jurisdiction to which the law is applicable. *See Gulf, C. & S.F. Ry. Co. v. Ellis*, 165 U.S. 150, 17 (1897).

102.   The CWA provides a national policy and framework for the protection of the nation's waters, 33 U.S.C. § 1251(a), and Congress explicitly prescribed the equal footing of States and tribes under the CWA, 33 U.S.C. §1377(a). The Final Rule however, creates a stark divide between those potentially holding undefined tribal treaty rights, and everyone else.

103.   In contravention of CWA policy, the Final Rule advances the rights of tribes and tribal members over those of the States and everyone else. The EPA's disparate treatment of non-tribal Americans exceeds EPA's statutory jurisdiction,

authority, and limitations under the CWA, 5 U.S.C. § 706(2)(C), and is in violation of the equal protection clause, U.S. Const., amend XIV, § 1.

104.   Accordingly, the Final Rule is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

## <u>COUNT III</u>
### (Violation of 5 U.S.C. § 706 – Arbitrary and Capricious Agency Action)

105.   Plaintiffs re-allege and incorporate by reference the facts and allegations set forth in all preceding paragraphs as if set forth in full herein.

106.   Under the APA, a final agency action may be held unlawful and set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). The Final Rule is a reviewable, final agency action. *See* 5 U.S.C. § 704.

107.   The EPA's decision is arbitrary and capricious under the APA because it relied on factors which Congress did not intend it to consider, it entirely failed to consider important aspects of the Final Rule, and it offered explanations for the Final Rule that run counter to evidence before it and that are so implausible that it could not be ascribed to difference in view or product of agency expertise. *See O'Keeffe's, Inc. v. U.S. Consumer Prod. Safety Comm'n*, 92 F.3d 940 (9th Cir. 1996) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

108.   There is no support for the proposition that Congress intended states (or the EPA, for that matter) to evaluate and protect tribal reserved rights in order to

discharge routine obligations under the CWA of protecting and promoting water quality standards.

109.   Indeed, nothing in the CWA suggests that tribal reserved rights limit or prohibit a state or the EPA from taking otherwise lawful actions to protect water quality standards, and EPA has failed to explain how it is authorized to promulgate additional CWA requirements limiting State authority based on potential tribal reserved rights. Similarly, the EPA has failed to explain why it is compelled to promulgate additional CWA requirements limiting state authority based on potential tribal reserved rights.

110.   Tribal reserved rights are not new features of federal law that suddenly require incorporation into the EPA's regulatory framework. They have long existed, yet the EPA has never before interpreted the CWA to impose the Final Rule's novel requirements. More importantly, tribal reserved rights existed at the time Congress passed the CWA, and upon passage, Congress did not give any indication that the CWA's scope included cognizance or enforcement of such rights.

111.   The CWA grants limited authority to EPA to regulate water quality standards established by the States. *See* 33 U.S.C. §§ 1251(a)(1-7), 1251(g), 1252(a). Because the Final Rule effectively regulates treaties and tribal reserved rights, EPA has acted arbitrarily and not in accordance with the law in promulgating the Final Rule.

112.   The EPA failed to consider the impact of the Final Rule on prior state efforts to establish water quality standards. For instance, between 2014 and 2019, Idaho undertook a lengthy and comprehensive water quality standard-setting process that

included conducting a statewide fish consumption study to set water quality standards, which included consideration of modern tribal fish consumption rates—water quality standards that were ultimately approved by the EPA for application across Idaho. Similarly, the NDDEQ also undertook a lengthy and comprehensive water quality standard setting process for North Dakota in 2017. See S.L. 2017, ch. 199, §1; N.D. Admin. Code. ch. 33.1-16-01. The Final Rule undermines those extensive and collaborative efforts and the EPA's own authorization of Idaho and North Dakota's water quality standards.

113.    The EPA failed to consider the impact of the Final Rule on established state water quality standards. Plaintiff States have issued water quality standards and the EPA has approved them, based on actual, documented data, like fish consumption rates. The Final Rule changes that system entirely, requiring Plaintiff States to rely on subjective, uncertain, and unverifiable information of what prior tribal generations may have consumed, unsupported assumptions as to how much fish tribal members might consume in the future, and non-science based assertions that certain water bodies' quality can be improved to support such unidentifiable consumption rates.

114.    The EPA failed to consider the practicability of setting or achieving excessively high water quality standards, the thousands of regulated entities that will be affected, nor the regulatory and economic impacts of designating vast new areas of Idaho as having impaired waters under the new standards. See 89 C.F.R. 35741-43 These mandated changes will preclude permitting discharges associated with important

economic activities. Further, the EPA provided no technical or scientific support for these mandates. *See* 40 C.F.R. § 131.11(a)(1) ("criteria must be based on sound scientific rationale and must contain sufficient parameters or constituents to protect the designated use"). The Final Rule is therefore arbitrary and capricious and unlawful under the APA.

115.    The EPA failed to consider the impact of the Final Rule on longstanding policies allowing states to make risk-management decisions. The Final Rule requires that Plaintiff States apply the same risk rate to small tribal subpopulations as it applies to the general population. This will result in water quality standards that are orders of magnitude more stringent than those required under existing regulations. The Final Rule will result in water quality standards that are more stringent than natural background detection levels and standards that cannot be reasonably met using cost-effective technologies.

116.    The EPA failed to consider the impact of the Final Rule on existing permits. Overly stringent risk levels mandating overly stringent water quality standards will result in the vast majority of covered waters being deemed impaired. In addition to numerous impairment designations, Plaintiff States will be required to develop and implement Total Maximum Daily Loads ("TMDLs") for these newly impaired waters. Discharge permits under the National Pollutant Discharge Elimination System ("NPDES") program will be required to include new, extremely conservative effluent limitations to ensure that dischargers do not cause or contribute to impairments. And,

all nonpoint source pollution controls will be implicated. Such permit changes will have significant, overly burdensome compliance costs for Plaintiff States and the industries operating within those states, as well as considerable impacts on Plaintiff States' economies.

117.   The EPA failed to consider the impact of the Final Rule for Plaintiff States with reservations straddling multiple states. For instance, in order for Plaintiffs North Dakota and South Dakota to evaluate rights of the Standing Rock Sioux Tribe—whose reservation splits the state boundary—not only would each state be required to agree with the tribe's claims, but neither state could proceed without the involvement and agreement of the other state.

118.   The EPA failed to consider the impact of the Final Rule on Plaintiff States' water rights determinations. The Final Rule is based on the premise that tribal treaties imply reserved rights to specific water quality, even in State waters outside of reservation boundaries. *See* 89 Fed. Reg. 35747; 89 Fed. Reg. 35721 ("Rights reserved to Tribes and reflected in treaties and other laws may apply in Indian country as well as outside of Indian country and may be express or implied"). By suggesting that treaties give tribes rights that extend outside of reservation boundaries, the Final Rule has significant and concerning implications for State water resource management. *See* 89 Fed. Reg. 35727 ("if a Tribe has a right to fish and provides data that a certain flow rate is necessary for fish survival, that would be potentially relevant under this rule").

119.   Similar broad claims were raised in Idaho's Snake River Basin Adjudication and the Coeur d'Alene Spokane River Basin Adjudication by the United States; and they were soundly rejected by Idaho courts. *See* ¶¶ 35-36, *supra*. The Final Rule suggests similar claims can be raised again, putting vested water rights at risk and challenging established Idaho and federal water law precedent in violation of the CWA. *See* 33 U.S.C. § 1251(g).

120.   The EPA failed to consider the impacts of the Final Rule on state water and resource management programs. The CWA explicitly reserves this role to the States, but the Final Rule will significantly undermine Plaintiff States' rights to manage water and land use. Further, the EPA's proposal would unlawfully "alter[] the federal-state framework by permitting federal encroachment upon a traditional state power," even though Congress did not authorize any such federal power in the CWA. *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engin'rs*, 531 U.S. 159, 173 (2001) (*SWANCC*). The EPA now grants itself the ability to disapprove State water quality standards it determines are not sufficiently protective of an asserted tribal reserved water right, including for a certain quantity or flow of water. This puts the EPA in the position of choosing whose claim to water should be protected—undermining and interfering with the States' longstanding role, as well as previously negotiated or litigated claims and decreed water rights.

121.   The EPA's failure to identify, quantify, and consider the foregoing, significant impacts of the Final Rule, and the agency's failure to present any scientific

or public health information to support or justify these changes, render the Final Rule arbitrary and capricious, and therefore unlawful under the APA.

122. The Endangered Species Act ("ESA") consultation requires each federal agency ensure that "any action <u>authorized</u>, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat." 16 U.S.C. § 1536(a)(2) (emphasis added). To achieve this objective, federal agencies are required to consult with the U.S. Fish and Wildlife Service or the National Marine Fisheries Service whenever a federal action "may affect" a listed species, or whenever there is "reason to believe that an endangered species or a threatened species may be present in the area affected by [the proposed action] and that implementation of such action will likely affect such species." 16 U.S.C. § 1536(a)(3); 50 C.F.R. § 402.14(a).

123. Nationwide, the U.S. Fish and Wildlife Service observes over sixteen-hundred (1600) listed species, sixteen (16) listed species with spatial current range believed to be, or known to be, in Idaho, and seven (7) listed species in North Dakota. While the Final Rule's "aquatic and/or aquatic-dependent resources" definition is vague and lacking in clarity, it is clear, at the very least, that the Final Rule will affect many of those listed species, including among others, the bull trout and white sturgeon in Idaho and the pallid sturgeon in North Dakota.

124.   When there is reason to believe a listed species "may be present in the area affected by [the proposed action] and that implementation of such action will likely affect such species," a federal agency may initiate either an informal or formal consultation with the U.S. Fish and Wildlife Service or the National Marine Fisheries Service. Under informal consultation, if the acting agency determines that the action "is not likely to adversely affect" listed species or critical habitat, the consultation process ends. 50 C.F.R. § 402.13(a).

125.   The EPA however, failed to engage in any consultation with either U.S. Fish and Wildlife Service or the National Marine Fisheries Service in regards to the Final Rule, despite the obvious effects the rule will have on listed species, as well as listed species' habitats.

126.   The EPA's failure to engage in required ESA consultation renders the Final Rule arbitrary, capricious, and in violation of the law, and is therefore unlawful under the APA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A) adjudge and declare that the rulemaking titled "Water Quality Standards Regulatory Revisions to Protect Tribal Reserved Rights" is unlawful because it is inconsistent with, and in excess of, EPA's authority under the CWA;

B) adjudge and declare that the Final Rule violates the Constitution of the United States;

C) adjudge and declare that the Final Rule is arbitrary, capricious, an abuse of discretion, not in accordance with the law, and otherwise contrary to constitutional rights and powers;

D) vacate the Final Rule;

E) award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including attorney's fees, associated with this litigation; and,

F) grant Plaintiffs such additional and further relief as the Court may deem just, proper, and necessary.

Dated May 28, 2024

//signature blocks to follow//

RAÚL LABRADOR
Attorney General of Idaho

/s/ Joshua N. Turner
Joshua N. Turner
*Chief of Constitutional Litigation and Policy*
Alan M. Hurst
*Solicitor General*
Tel : (208) 332-2400
josh.turner@ag.idaho.gov
Counsel for State of Idaho

DREW H. WRIGLEY
Attorney General of North Dakota

/s/ Philip Axt
*Solicitor General*
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Tel: (701) 328-2210
pjaxt@nd.gov
Counsel for State of North Dakota

TREG TAYLOR
Attorney General of Alaska

/s/ Masha Kazakova
Masha Kazakova
*Assistant Attorney General*
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
(907) 269-5232
masha.kazakova@alaska.gov
Counsel for the State of Alaska

BRENNA BIRD
Attorney General of Iowa

/s/    Eric H. Wessan
Eric H. Wessan
*Solicitor General*
1305 E. Walnut Street
Des Moines, Iowa 50319
Tel : (515) 823-9117
eric.wessan@ag.iowa.gov
Counsel for State of Iowa


MICHAEL T. HILGERS
Attorney General of Nebraska

/s/ Zachary A. Viglianco
Zachary A. Viglianco
*Deputy Solicitor General*
Office of the Attorney General of Nebraska
2115 State Capitol
Lincoln, NE 68509
(402) 471-2683
Zachary.Viglianco@nebraska.gov
Counsel for State of Nebraska


ALAN WILSON
Attorney General of South Carolina

/s/    Joseph D. Spate
Joseph D. Spate
*Assistant Deputy Solicitor General*
Post Office Box 11549
Columbia, SC 29211
Tel: (803) 734-3371
josephspate@scag.gov
Counsel for the State of South Carolina

MARTY JACKLEY
Attorney General of South Dakota

/s/ Jennifer L. Verleger
Jennifer L. Verleger
*Assistant Attorney General*
South Dakota Attorney General's Office
1302 East Highway 14, Suite 1
Pierre, SD 57501
(605) 773-2243 (phone)
jennifer.verleger@state.sd.gov
Counsel for the State of South Dakota

BRIDGET HILL
Attorney General of Wyoming

/s/    Travis Jordan
Travis Jordan
*Senior Assistant Attorney General*
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895 (phone)
(307) 777-3542 (fax)
travis.jordan@wyo.gov
Counsel for the State of Wyoming